**DEUTERIUM CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**EIC Laboratories, Inc., Third–Party Defendant.**

No. 425–82C.

United States Claims Court.

March 9, 1989.

See also 4 Cl.Ct. 361.

David M. Singer, Greenwich, Conn., for plaintiff.

Oscar A. Towler, III, Washington, D.C., with whom was Donald E. Townsend, and Asst. Atty. Gen. John R. Bolton, for defendant.

Charles Winchester, Boston, Mass., for third-party defendant.

## OPINION

RADER, Judge.

In this patent infringement suit, Deuterium Corporation (Deuterium), seeks compensation under 28 U.S.C. § 1498(a) (1982) from the United States for the unauthorized use of U.S. Patent No. 4,123,506 (the '506 patent). This patent covers a process for removing hydrogen sulfide from geothermal steam used to generate electricity. Hydrogen sulfide, known collo-

quially as "rotten egg" gas, both offends human olfactory sensitivities and combines with water to form a corrosive agent, sulfuric acid. Thus, unless treated to remove impurities, geothermal steam pollutes the atmosphere and damages machinery used to generate electricity.

Deuterium contends that Pacific Gas and Electric (PG & E), in a joint venture or partnership with the United States, employed the '506 patent to purify steam at Geothermal Power Plant No. 7, The Geysers, California. The plaintiff alleges two unauthorized uses of its patent. The plaintiff asserts that the Government employed the '506 patent to generate electricity with purified steam during a 120–hour test period in 1978. The plaintiff also claims that the Government used purged steam to heat reactants inside a pilot plant run by EIC Laboratories, Inc. (EIC), PG & E's subcontractor.

On August 26, 1982, the plaintiff commenced this action. Before the United States Claims Court, the parties filed a flurry of discovery motions. This court's docket sheet shows that the parties filed no fewer than twenty motions, oppositions to motions, replies or orders in a single month (October 1983). In November 1983, the defendant filed a summary judgment motion alleging an experimental privilege that exempted the defendant from infringement liability. This motion, which prompted another barrage of motions and counter-motions (the informal docket sheet shows twenty-seven entries for November 1983), is still pending. At length, in 1984, a judge previously assigned this case suspended all proceedings, except the filing of a new motion for partial summary judgment on the patent infringement issue.

Pursuant to court order, the defendant filed the present motion for partial summary judgment. A later memorandum from the plaintiff outlining the status of this case presented the reasons for this partial motion:

It was [the court's] intention and the understanding of the parties that this defendant's motion and plaintiff's opposition would have the effect of cross-motions for summary judgment, since there was no dispute between the parties as to the material facts concerning the processes that were used by defendant and its partner Pacific Gas and Electric Company (PG & E) and that plaintiff has accused of patent infringement.

Pl.'s Memo filed July 15, 1987, at 1. The case, with its pending partial motion for summary judgment, was assigned to this court on October 17, 1988.

After argument, the motion for partial summary judgment filed by the defendant and opposed by the plaintiff is now before the court. EIC supports the defendant's motion. Invoking RUSCC 56, the defendant asserts that no genuine issue of material fact prevents the court from ruling, as a matter of law, that PG & E's use of purged steam during the 120–hour test in 1978 did not employ each of the required steps of the '506 patent or their equivalents. The second part of the defendant's motion contends that the plaintiff, by releasing its claim against EIC for infringement, also released the United States from any liability for work performed in EIC's pilot plant. The plaintiff also has moved the court to strike twenty pages from the appendix of the defendant's motion for partial summary judgment.

After hearing argument, this court grants the defendant's motion in part and denies it in part. This court sustains the first part of the Government's motion concerning the 120–hour test. This court denies the second part of the defendant's motion relative to release of EIC. This court also grants the plaintiff's motion to strike.

## BACKGROUND

Geothermal steam is an important energy source in some regions of the nation. In these regions, unique geological formations send steam rushing to the earth's surface under enormous pressure. This pressurized steam turns turbines to produce electricity.

The primary difficulty with employing geothermal steam to generate electricity, however, has been the impurities within the

steam, particularly hydrogen sulfide. Hydrogen sulfide in the presence of moisture (steam) reacts to form sulfuric acid. Sulfuric acid, in turn, corrodes the turbine and other metallic equipment necessary for the generation of electricity.

Additionally, hydrogen sulfide is a noxious pollutant if released untreated into the atmosphere. Other contaminants in geothermal steam, such as ammonia or methane, also complicate the problems of pollution and corrosion. In sum, geothermal steam, although an efficient energy source, creates some smelly and corrosive problems.

To combat the corrosion problem, turbines and other equipment in geothermal plants have been constructed with specialized materials that resist corrosion. Expensive specialized equipment, however, reduces the economic efficiency of geothermal power plants and offers no solution to the pollution problem.

In practice, geothermal power plants have not resolved satisfactorily the pollution problem. After use, geothermal steam condenses in a cooling tower. Effluents from the cooling tower—both water and noncondensable gases—contain hydrogen sulfide. Past efforts to combat geothermal steam pollution have been unsatisfactory in terms of expense, collection and disposal of waste sulfur, and failure to take advantage of the ammonia in the steam.

Before issuance of the '506 patent, other patents had secured methods of cleansing polluted gases, including steam. For instance, Thomas S. Bacon invented U.S. Patent No. 2,019,468, a chemical scrubbing process to remove pollutants from gases. In the Bacon process, steam or other polluted gases pass through an aqueous alkaline solution. In the liquor, hydrogen sulfide undergoes a chemical reaction which, according to the specification of the Bacon patent, renders the treated gases "substantially free of hydrogen sulphide." This method, known since at least 1931, nonetheless suffered from some of the same

defects that plague other hydrogen sulfide pollution abatement procedures.

With this background, Jerome S. Spevack filed for a patent to improve the process for removing hydrogen sulfide from steam in 1976. During this process, Mr. Spevack made many alterations in his original proposal to satisfy the Patent and Trademark Office (PTO).[1] At length, in October 1978, the PTO granted Mr. Spevack U.S. Patent No. 4,123,506. Deuterium then succeeded Mr. Spevack in rights to the '506 patent. Later in 1978, Deuterium contended that the Government had infringed the patent by two unauthorized uses at The Geysers. These allegations led to this lawsuit.

With respect to the first alleged unauthorized use, the 120–hour test, the defendant contends that it did not employ literally each step, (a) through (f), of claim 57, and therefore, did not infringe the plaintiff's patent. Specifically, the defendant asserts that it did not employ literally step (d)— concerning delivery of cleansed steam for use in the system—and step (f)—concerning discharge of effluents substantially free of hydrogen sulfide. The defendant also maintains that its conduct did not infringe claim 57 by virtue of the doctrine of equivalents. Accordingly, the defendant seeks partial summary judgment to establish, as a matter of law, the absence of any infringing use.

The plaintiff opposes the motion contending that the defendant literally employed each of claim 57's steps, including (d) and (f). Alternatively, the plaintiff asserts that the defendant's process was the substantial equivalent of claim 57.

With respect to the second alleged unauthorized use, the heat exchanger within EIC's plant, another judge of the Claims Court ruled:

> (2) For the purposes of this action, it will be conclusively presumed that the participation of third-party defendant E.I.C. Laboratories, Inc. in The Geysers project did not constitute direct infringement,

1. *See* the discussion of the '506 patent's prosecution history under the heading "Doctrine of Equivalents."

contributory infringement or inducement to infringement of any of plaintiff's patents.[2]

Order filed Mar. 4, 1985, at 1. The defendant contends that this interlocutory order releasing EIC from any infringement liability due to its participation at The Geysers also released the Government. The plaintiff opposes this interpretation of the court's order and maintains that release of EIC did not apply to the Government.

The defendant submitted with its motion a copy of the file wrapper and contents of the patent in question. The plaintiff moves the court to strike twenty pages from that submission.

Accordingly, this court must determine, pursuant to the proper standards and care required for summary judgment motions in infringement actions, (1) whether the defendant's process during the 120–hour test literally infringed claim 57, (2) whether the defendant's process during the 120–hour test infringed claim 57 pursuant to the doctrine of equivalents, and (3) whether the Claims Court's interlocutory order released the Government of all liability with respect to the heat exchanger in the EIC plant. In addition, the court resolves the motion to strike.

## DISCUSSION

### I. *Standards for Summary Judgment*

Following RUSCC 56(b), the defendant moves for summary judgment asserting the absence of any genuine issue of material fact and claiming entitlement to judgment as a matter of law. As the moving party, the defendant bears the burden of proving both the absence of genuine issues of material fact and entitlement to a legal judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Doubts about the evidence must be resolved in favor of the plaintiff, the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S.

654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

To avoid summary judgment, the plaintiff, as the nonmovant, must show a genuine and material dispute of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). With respect to issues on which it bears the burden of proof, the plaintiff also must "make a showing sufficient to establish the existence of [every] element essential to [its] case." *Id.* at 322, 106 S.Ct. at 2553. When attempting to make these showings, the plaintiff may not prevail by merely denying evidence or by asserting unsubstantiated conclusions. *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed.Cir.1984). The substantive law applicable to this case, specifically 28 U.S.C. § 1498(a), determines what facts are material. Only factual disputes that might affect the outcome of the suit will properly prevent an entry of judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

While these traditional standards of RUSCC 56(b) are fully applicable to patent suits, *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985), the Federal Circuit has cautioned that summary judgement on the issue of infringement must be approached with care. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). Indeed, because the ultimate determination of infringement (in contrast to the initial interpretation of the claim) is itself a fact issue, this court must approach a motion for summary judgment with care proportioned to the likelihood of its being appropriate. *Chemical Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1571 (Fed.Cir. 1986); *SRI Int'l*, 775 F.2d at 1116.

Despite the intense factual nature of the infringement inquiry, summary judgment

---

**2.** Under the terms of 28 U.S.C. § 1498, the jurisdictional statute for patent actions before this court, the Government can be sued only for direct "infringement," *see infra* note 3, not for

inducement or contributory infringement. *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed.Cir.1984).

is appropriate where comparison of a properly interpreted claim with an uncontested description of the accused device or process reflects the absence of a genuine issue of material fact. *Chemical Eng'g*, 795 F.2d at 1571; *Porter v. Farmers Supply Serv. Inc.*, 790 F.2d 882, 884 (Fed.Cir.1986); *Palumbo*, 762 F.2d at 973. In this case, the parties have stipulated to the material facts associated with the accused processes. Moreover, as noted earlier, the parties consider this partial summary judgment motion to have the effect of cross-motions for summary judgment. No contested material facts about the accused processes remain.

## II. *Standards for Infringement*

The inquiry for patent infringement[3] requires a two-step analysis. In the first step—claim interpretation—the court must define the patented process or, in other words, ascertain the scope of the claims. In the second step—the ultimate determination of infringement—the court must decide whether the claims cover the accused process. *Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1269–70 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282 (Fed.Cir.1986); *Palumbo*, 762 F.2d at 974; *Lemelson v. United States*, 14 Cl.Ct. 318, 322 (1988). Thus, the infringement inquiry poses two distinct questions: first, what is patented, and second, has what is patented been used by the Government. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569

(Fed.Cir.1983); *SSIH Equip. S.A. v. ITC*, 718 F.2d 365, 376 (Fed.Cir.1983).

◼ Claim interpretation, the first step in infringement analysis, necessarily precedes a determination of whether an accused process has infringed the claims. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986); *Lemelson v. United States*, 752 F.2d 1538, 1549 (Fed.Cir.1985). The property right bestowed by the patent is, after all, measured by the scope of the claims. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). The patent claims both distinguish the process from prior art and define the breadth of protection afforded by the patent. Thus, a claim enables potential users of a process to distinguish what infringes from what does not. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The claims also measure the invention or process. *SRI Int'l*, 775 F.2d at 1121.

Claim interpretation is a question of law. *Moeller*, 794 F.2d at 656; *Moleculon*, 793 F.2d at 1261; *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). The court, however, must resolve disputes over the meaning of claim terms as a question of fact before interpreting the claim. *Perini Am., Inc. v. Paper Converting Machine Co.*, 832 F.2d 581, 584 (Fed.Cir.1987).

◼ When interpreting a claim, a court must consider various sources of informa-

---

3. 28 U.S.C. § 1498, the basis for patent jurisdiction before this court, does not use the term "infringement":

> (a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Claims Court for the recovery of his reasonable and entire compensation for such use and manufacture....

Although § 1498 entitles a patent owner to recover reasonable and entire compensation for

unlicensed use by the United States of inventions or processes "covered by a patent," the legal standards for ascertaining a § 1498 violation are parallel to the standards for ascertaining infringement under 35 U.S.C. § 271. *Motorola*, 729 F.2d at 768. With respect to the two-step analysis for patent use or infringement, however, no significant distinctions between an action under 35 U.S.C. § 271 and an action under 28 U.S.C. § 1498 exist. Accordingly, this court uses "infringement" as a familiar term accurately describing the central and relevant requirements of § 1498.

tion about the meaning of the terms.[4] In addition to the obvious sources in the claim language and the specification, the court should also consult the patent's prosecution history and other claims within the same patent. *Howes,* 814 F.2d at 643; *Moeller,* 794 F.2d at 656; *Mannesmann,* 793 F.2d at 1282. A court may also employ texts, such as dictionaries, to illuminate the usage of disputed claim terms. *See, e.g., Fromson,* 720 F.2d at 1569. In accord with these principles, the court must carefully determine what meaning the inventor has ascribed to the terms used in the claim.

■ The second step of infringement analysis—the ultimate determination of infringement—requires the court to decide whether the accused process literally embodies every element of the properly interpreted claim. *Mannesmann,* 793 F.2d at 1282; *Stewart–Warner Corp. v. City of Pontiac,* 767 F.2d 1563, 1568 (Fed.Cir. 1985). When determining literal infringement, the court is essentially deciding whether the accused process is the same invention defined by the claims. The mere addition of a component, *Loctite,* 781 F.2d at 861; or ingredient, *Atlas Powder Co. v. E.I. du Pont De Nemours,* 750 F.2d 1569 (Fed.Cir.1984); *Bio–Rad Laboratories, Inc. v. Nicolet Inst. Corp.,* 739 F.2d 604, 614 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984), however, will not bar a finding of literal infringement, unless the added feature produces a radically different system. *Data Line Corp. v. Micro Technologies, Inc.,* 813 F.2d 1196 (Fed.Cir.1987). The determination of

whether the claim "reads on" the accused process is a question of fact. *Atlas Powder,* 750 F.2d at 1569.

■ Although failing to employ every literal detail of a claimed invention, an accused process may still infringe the patent if the processes are substantially equivalent. The classic doctrine of equivalents[5] asks whether the accused process "performs substantially the same function in substantially the same way to obtain the same result" as the patent claim. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This test for equivalence is an equitable doctrine. *Pennwalt,* 833 F.2d at 935; *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir.1983). The test for equivalence prevents unscrupulous copyists from evading the law by making unimportant and insubstantial changes in the patent. *Yarway Corp. v. Eur–Control USA Inc.,* 775 F.2d 268, 275 (Fed.Cir.1985).

Because the equivalence test deviates from the principle that the public ought to be able to find out the precise limits of patent protection without recourse to a judicial ruling, *Texas Instruments, Inc. v. ITC,* 805 F.2d 1558, 1572 (Fed.Cir.1986), the Federal Circuit has cautioned against application of the doctrine "to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change." *Pennwalt,* 833 F.2d at 935. Accordingly, a court must

**4.** When interpreting a claim, a court must recognize that patentees are their own lexicographers. *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985); *Gore,* 721 F.2d at 1558. Because dictionaries cannot keep pace with technology, patentees may coin new expressions to communicate their invention. *Fromson,* 720 F.2d at 1569. Nonetheless, words must be given their customary and familiar meaning unless the context suggests that the inventor endowed them with some unique significance. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir.1984).

When interpreting the terms of a claim, the court may properly construe words according to the usage and understanding of those with ordinary skill in the art. *Fromson,* 720 F.2d at 1571; *Schenck, A.G. v. Nortron Corp.,* 713 F.2d 782,

786–87 (Fed.Cir.1983). Although expert witnesses are often valuable in interpreting terms within a particular art, *Moeller,* 794 F.2d at 656, the court may construe claims as a matter of law without expert advice when its terms do not have a special meaning to those skilled in the art. *Howes,* 814 F.2d at 643.

**5.** The Federal Circuit appears to use the designations "doctrine of equivalents" and "doctrine of equivalence" interchangeably. *Compare Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), *with Nestier Corp. v. Menasha Corp.,* 739 F.2d 1576 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985).

ensure that application of the doctrine of equivalents does not redefine the scope of the claims beyond "the greater interest of justice." *Texas Instruments*, 805 F.2d at 1572. A pioneer invention consequently may be, if otherwise warranted, entitled to a broader range of equivalents, *Kinzenbaw v. Deere & Co.*, 741 F.2d 383 (Fed.Cir.), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1984); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572 (Fed.Cir.1983), than a narrow improvement in a crowded field. *Hughes Aircraft*, 717 F.2d at 1351.

In applying the doctrine of equivalents, a court must proceed with an element-by-element comparison of the accused process and the claim. The Federal Circuit has established that "each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Pennwalt*, 833 F.2d at 935, quoting *Lemelson*, 752 F.2d at 1551.

Further, the Federal Circuit has recognized two basic limitations on the application of the doctrine: first, prosecution history estoppel, namely arguments or amendments made by the applicant during prosecution estop the patentee from asserting a range of equivalents dropped during the patent application process; and second, prior art, namely evidence that the equivalent device is already in the public domain. *Loctite*, 781 F.2d at 870.[6]

Thus, the second step of the infringement analysis requires the court to determine, by conducting an element-by-element comparison of the claim with the accused process, whether the accused process replicates the claim or its substantial equivalent.

III. *Literal Infringement of the '506 Patent*

1. The '506 Process

The '506 patent, entitled "Utilization of Impure Steam Contaminated with Hydro-

gen Sulfide," proposed to improve on the prior art of purging steam of hydrogen sulfide. As one improvement, the '506 process proposed to clean geothermal steam upstream of the turbine and other mechanical equipment. Of most prominent importance, the '506 patent departed from conventional practice by promising to render both forms of steam effluent, liquid condensates and noncondensable gases, substantially free of hydrogen sulfide pollutants. Indeed, this advance was necessary to gain PTO approval for the patent.

This invention had several obvious benefits. First, this process addressed the pollution problem, by guaranteeing that effluents would be substantially free of hydrogen sulfide. Second, by cleaning steam before its contact with mechanical equipment, this process promised to reduce significantly the hazards of corrosion. Third, the '506 patent captured useful byproducts, like ammonia, from the steam. Finally, unlike steam produced from surface water, geothermal steam contains higher proportions of water's heavy isotopes. Therefore, the new process claimed also to provide a valuable source for production of heavy water or deuterium. In sum, the '506 process professed to improve in several ways the utility of geothermal steam as an energy source.

The '506 patent specification describes the invention as extracting hydrogen sulfide and other substances from geothermal steam "to improve the utility of the steam as an energy source, to reduce environmental pollution from usage of such steam, to recover valuable byproducts...." The '506 patent, col. 1, lines 12–15 (Oct. 31, 1978). The '506 patent issued with eighty-two claims. The plaintiff alleges infringement of claims 57–60, 62–67, 71, 72, 77, 78 and 81, and either claims 73 and 74 or 75 and 76. Claim 57, however, is the only independent claim asserted by the plaintiff. The other asserted claims depend directly or indirectly on claim 57. Claim 57 states:

---

**6.** The Federal Circuit has recently introduced a third potential limitation on the doctrine. Where the rapidity of technological advances within a field result in multiple minor departures from a literal reading of the claim, the totality of change in the invention as a whole may override a holding of infringement. *Texas Instruments*, 805 F.2d at 1571.

A process controlling emissions of hydrogen sulfide from a system which utilizes a flow of geothermal steam at superatmospheric pressure and produces discharges of liquid water and of noncondensable gases, said steam containing said noncondensable gases together with hydrogen sulfide as impurities therein, which process comprises:

(a) providing a flow of aqueous liquid phase containing reactant dispersed therein, said reactant consisting essentially of at least one metal compound having the capability of undergoing reaction with aqueous hydrogen sulfide at the temperature of and in the presence of said flow of geothermal steam to form a solid metal sulfide reaction product suspended in said flow of liquid, said sulfide having a solubility product, at 25 C°, smaller than $10 \times 10-15$,

(b) passing said flow of geothermal steam at superatmospheric pressure in contact with said flow of aqueous liquid phase to extract hydrogen sulfide from said flow of geothermal steam by transferring the same into said liquid flow and effecting said reaction with hydrogen sulfide therein,

(c) recovering from said contact the resulting flow of steam at superatmospheric pressure containing noncondensable gases, but depleted in hydrogen sulfide, and the resulting flow of aqueous liquid and metal sulfide reaction product,

(d) delivering said recovered flow of steam at superatmospheric pressure to said system for said utilization as an energy source,

(e) condensing liquid water from said steam in said system,

(f) discharging from said system (1) liquid water condensate substantially free of hydrogen sulfide and (2) said noncondensable gases substantially free of hydrogen sulfide.

Claim 57, the central focus of this lawsuit, describes the patented process. First, the flow of impure steam passes through an aqueous reactant upstream from mechanical equipment, such as the turbine, condenser, or the heat exchanger. The liquid reactant remains at the same pressure and temperature as the steam to prevent depletion of the steam's strength. Second, the aqueous solution contains metallic compounds highly susceptible to reaction with hydrogen sulfide. Therefore, chemical forces transfer the pollutants from the steam into the liquid. Third, the steam—now depleted in hydrogen sulfide—emerges from the liquid flow at superatmospheric pressure and goes via the main pipes to the turbines. Fourth, in addition to waste sulfur, the liquid reactant yields ammonia and valuable trace metals. Fifth, the steam, after driving the turbines, condenses in a cooling tower, from whence heavy water could be recovered. Finally, both the liquid condensate and noncondensable gases from the steam enter the environment substantially free of hydrogen sulfide.

## 2. The Alleged Infringing Uses

The plaintiff has limited its charges of infringement to two particular uses that occurred in the work under the Government's cooperative agreement with PG & E (and PG & E's subcontractor, EIC). The parties to this suit have stipulated to the material facts about the accused processes. The first alleged infringing use arises from a 120–hour test performed in Power Plant Unit No. 7 at The Geysers, California.

In Power Plant No. 7, approximately 1,000,000 pounds per hour of geothermal steam pass through a main steam line to drive a turbine. After use, the steam condenses in a cooling tower. Noncondensable gases vent from the cooling tower into the atmosphere.

During the accused 120–hour test, EIC operated a pilot plant to cleanse one-tenth of the normal flow of geothermal steam from the wells. The 120–hour test diverted and treated 100,000 pounds per hour of steam to remove hydrogen sulfide. The treatment removed about 98.5% of the hydrogen sulfide from the treated steam. The treated steam then mixed with the

remaining 900,000 pounds per hour of untreated steam in the main line before entering the turbine. Thus, the total flow of treated and untreated steam used in the turbine contained about 90% of the hydrogen sulfide originally present in the geothermal steam. Due to mixing in the main line and turbine, the treated steam was indistinguishable from the untreated steam upon discharge from the turbine.

The steam discharged from the turbine to the condenser was proportionally less polluted with hydrogen sulfide, but was not substantially free of hydrogen sulfide. The water and noncondensable gases discharged from the condenser also were proportionally less polluted with hydrogen sulfide, but were not substantially free of the pollutant. In simple terms, the accused process discharged marginally cleaner, but not clean, steam and steam byproducts.

The second alleged infringing use of the '506 patent occurred inside the EIC pilot plant. Treated steam was used to heat a copper sulfate solution. The heat exchanger supplied heated copper sulfide solution to the EIC pilot plant scrubber. According to the plaintiff, the steam and steam byproducts issuing from the heat exchanger contained no more hydrogen sulfide than did the treated steam and consequently were substantially free of hydrogen sulfide.

The specifics of the heat exchanger process, however, are not before the court on defendant's motion. Accordingly, this court need not assess the heat exchanger incident for infringement under the two-step legal analysis. Instead, this court must assess the legal implications of the Claims Court's order of March 4, 1985, releasing EIC from any liability in connection with the second alleged infringing use.

### 3. Element (d)—Claim Interpretation

■ The parties agree that claim 57 is the only independent claim necessary for this court to examine for infringement. The plaintiff charges that the defendant literally employed the process described in claim 57 during a 120-hour test in 1978. The defendant responds that it did not employ element (d) and element (f) of the claim and, therefore, did not infringe the '506 patent.

Step (d) of claim 57 requires delivery of "said recovered flow of steam at superatmospheric pressure to said system for said utilization as an energy source." According to these terms, element (d) requires that steam treated according to the preceding steps (a) through (c) be delivered to the system for generation of electricity.

The defendant contends that its accused process did not literally infringe step (d), because "the overall composition of the steam entering and discharging from the turbine was *not* substantially free of hydrogen sulfide." Def. Brief filed Sept. 6, 1985, at 16. The defendant contends that "said system" to which the recovered steam must be delivered for utilization begins at the turbine.[7] Accordingly, because the accused process delivered the clean steam to the main line leading to the turbine, rather than to the turbine itself, the defendant claims that it did not infringe the patent.

The plaintiff, on the other hand, contends that the language of element (d) merely requires "that a flow of geothermal steam which has been recovered from the treatment of steps (a) and (b) be delivered to a utilizing system." Pl. Brief filed Oct. 7, 1985, at 17. The plaintiff, therefore, does not place the same restrictions on the definition of "said system" as the defendant.[8]

7. In oral argument, counsel for the defendant clarified this position:

> The Court: What is meant by the term, "Said system"?
> Mr. Townsend: Well, that is in the preamble, Your Honor, and we believe the system it refers to is one which utilizes the flow of geothermal steam. That is on the second line of the preamble of Claim No. 57.

> The system that we have here is the turbine. We believe the system starts at the turbine. Transcript of Proceedings, No. 425–82C, Nov. 9, 1988, at 32.

8. As shall be discussed under the heading "Element (f)," the plaintiff places other restrictions on the meaning of the term "said system," but not the same restrictions employed by the defendant in interpreting step (d).

The parties disagree about the meaning of the term "said system." Further, the parties disagree whether element (d) of claim 57 requires that purged steam, and only purged steam, be delivered to that system.

When interpreting the scope of the claim, the court's inquiry must necessarily focus on the language of the claim itself. *Howes*, 814 F.2d at 643. The preamble to claim 57 includes a functional definition of "said system:"

> a system ... utilizes a flow of geothermal steam at superatmospheric pressure and produces discharges of liquid water and of noncondensable gases....

'506 Patent, col. 18, lines 26–29. Thus, when step (d) says "said system," it refers to a system which meets this description.[9] To satisfy this description, a system must: 1) utilize a flow of geothermal steam; 2) maintain the utilized steam at superatmospheric pressure; and 3) produce discharges of both liquid water and noncondensable gases. Each of these characteristics is important to the description of "system" in the claim language. Thus, the claim envisions a system conveying geothermal steam at superatmospheric pressure from wells to a turbine and later discharging two kinds of effluents. The "system" described in the claim does not necessarily begin at the turbine, but includes the conveying pipes that maintain the steam at superatmospheric pressure.

In addition to the language of the claim, the specification helps define the scope of the claim. *Howes*, 814 F.2d at 643. The specification indicates that the inventor designed the process with the power plant at The Geysers in mind. Indeed, the inventor developed the '506 patent while attempting to cleanse steam at The Geysers. The inventor thus expected that one potential utilization system for the patent was already operative at The Geysers. The specification explicitly refers to The Geysers:

> These objects [of the patent] will be readily understood by reference to approximate analyses of the contaminants present in geothermal steam such as is found in wells in the California area known as "The Geysers."

'506 Patent, col. 2, lines 41–44. In describing the objectives of the '506 patent, the inventor referred directly to the system in operation at The Geysers. The inventor expected that this patented process could have application to The Geysers' power generation system.

The power generation system at The Geysers also included each of the three essential characteristics in claim 57's description of a utilization system. Geothermal steam from the wells stayed at superatmospheric pressure in pipes leading to the turbines. The turbines generated electricity from the pressurized steam. Finally, the spent steam from the turbines condensed to produce discharges of both liquid water and noncondensable gases. The specification's reference to The Geysers, thus, provides additional evidence of the meaning of the claim term "said system."

In light of the language of the claim and specification, the defendant's proposed limitation on the term "said system" appears overly restrictive. The claim clearly requires use of steam at superatmospheric pressure. The maintenance of superatmospheric pressure requires pipes leading from the wells to the turbine. Furthermore, by referring to the system at The Geysers in the specification, the inventor indicated that Power Plant No. 7 (or similar geothermal power plants)—complete with main line pipes, turbines, heating units, and condensers—would fit within the definition of utilization system in claim 57. Thus, the term "said system" includes the conveyance pipes necessary to maintain superatmospheric pressures and carry the steam to the turbine.

---

**9.** The terms in the preamble to a claim are deemed limitations in the claim only where necessary to give meaning to the claim and properly define the invention. *See, e.g., Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 896 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *In re Bulloch*, 604 F.2d 1362, 1365 (CCPA 1979). When construing the '506 patent, the terms of the preamble are necessary to give meaning to the claim and to properly define the invention.

### 4. Element (d)—Infringement Analysis

The second step of infringement analysis requires the court to determine whether the claims cover the accused use. In the accused use, the EIC pilot plant bled off and treated a flow of 100,000 lbs. per hour of geothermal steam according to steps (a) and (b) of claim 57. Subsequently, the 100,000 pounds per hour of purged steam at superatmospheric pressure according to step (c) emerged from chemical treatment and passed through pipes leading to the turbine in PG & E's power plant. In the pipes leading to the turbine, the clean steam mixed with 900,000 pounds per hour of contaminated steam. Upon entering the turbine, the clean and contaminated steam were indistinguishable.

The defendant argues that step (d) was absent in the 120–hour test because "[c]lean steam was not *used* in the turbine." Def. Brief filed Sept. 6, 1985, at 17 (emphasis added). This argument fails for two reasons. First, claim 57 states that the clean steam must be delivered to "said system" for utilization, not to the turbine for utilization. The system as defined by the claim is not limited to the turbine, but includes as well the pipes leading into the turbine. By delivery into the main line, the accused process accomplished delivery of the recovered flow of steam to "said system." Second, claim 57 does not discuss the use of steam, but the delivery of steam. Although the defendant may be correct that clean steam was not used in the system, clean steam was delivered to the system. Therefore, delivery of clean steam to the system satisfied the demands of step (d).

In fact, even if the term "system" were defined narrowly as beginning at the turbine, the accused process would still have satisfied step (d). Element (d) requires that a flow of geothermal steam—recovered at superatmospheric pressure as specified in element (c) from the cleansing process specified in elements (a) and (b)—be delivered to a utilizing system. The language of (d) does not dictate that all steam delivered to the system must be depleted in hydrogen sulfide, but only that the depleted steam be so delivered.

Of particular importance to (d) is the language limiting the scope of the step to "recovered steam." Step (d) does not govern delivery of all the steam that might be used in the system. Step (d) pertains only to the flow of steam "recovered" from the process in step (c).

The defendant nonetheless argues that the depleted steam was not delivered to the turbine in the condition of depleted steam. According to the defendant, the clean steam was not delivered to the turbine because, upon arrival at the turbine, it was no longer clean. The claim language, however, says nothing of the condition of all steam in the system, but refers only to the delivery of recovered steam. Nor does the language of (d) require that the recovered steam remain clean until entering the turbine. During delivery, the recovered steam was recontaminated, but the terms of (d) do not preclude such an occurrence. In an attempt to avoid the literal meaning of (d), the defendant argues for conditions not specified in the element's language.

The defendant also suggests that the patent's prosecution history and specification make removal of hydrogen sulfide upstream of the turbine a feature of the '506 patent which can only be satisfied by delivery of clean steam, and only clean steam, to the turbine. The patent's prosecution history and specification are indeed important aspects of the claim interpretation phase of infringement analysis. *Howes,* 814 F.2d at 643. The specification states:

> The principal object of the patent invention is to depart from practices of treating condenser effluents after condensation of water condensate from contaminated steam in order to control environmental pollution and instead to remove hydrogen sulfide contained in impure steam, more particularly geothermal steam ... prior to its use as an energy source.

'506 patent, col. 2, lines 7–16. The accused process did remove hydrogen sulfide before use of *recovered* steam as an energy source. The objectives of the '506 patent

were met by the accused process with regard to the recovered steam, to which step (d) is clearly limited.

The prosecution history in this case indicates that the inventor placed considerable emphasis on removal of hydrogen sulfide prior to use of geothermal steam as an energy source. Again, with respect to recovered (and cleansed) steam, to which step (d) limits itself, these aims were accomplished. Neither the prosecution history nor the specification is inconsistent with the language of the claim requiring delivery of recovered steam.

When drafting the terms of claim 57, the inventor used language that required delivery of recovered steam to the utilizing system. During the accused process, this delivery occurred. Because the recovered flow of steam was delivered for use as an energy source, albeit in combination with untreated steam, step (d) was literally employed by the defendant.

To summarize, the defendant made several arguments to escape infringement of step (d); each failed. The defendant argued for strict limits on the term "said system", but did not demonstrate the absence of a genuine issue with respect to its interpretation of this term.[10] To the contrary, the record shows that the accused process did deliver recovered (and cleansed) steam to the system. Moreover, the defendant contended that the prosecution history and context of claim 57 suggested that only purged steam may be delivered to the turbines. The language of the claim, however, limited itself to recovered steam. Because the recovered steam was clean before delivery to the system, the accused process satisfied the terms of (d).

### 5. Element (f)—Claim Interpretation

■ Step (f) of claim 57 covers "discharging from said system (1) liquid water condensate substantially free of hydrogen sulfide and (2) said noncondensable gases substantially free of hydrogen sulfide." Step (f) requires the discharge from the system of liquid water condensate and noncondensable gases—both to be expelled "substantially free of hydrogen sulfide." After geothermal steam has been chemically cleansed according to steps (a) and (b), recovered at superatmospheric pressure according to (c), delivered to the utilizing system according to (d), and condensed according to (e), step (f) specifies that both any condensed liquid water and any noncondensable gases discharged from the system must be substantially free of hydrogen sulfide.

The plaintiff contends that step (f) "relates only to the discharging of condensate and gases which have resulted from the system embodying the claimed process." Pl. Brief filed Oct. 7, 1985, at 18. The plaintiff argues that step (f)'s only function is discharging the steam cleansed pursuant to the earlier steps. Accordingly, the plaintiff considers it "implicit" that the term "substantially free of hydrogen sulfide" refers only to the disposition of depleted steam. *Id.* at 19. In essence, the plaintiff would limit the term "said system" in step (f) to the cleansing system specified in the '506 patent.

The defendant contends that the language of step (f) requires that discharges from the entire system be "substantially free of hydrogen sulfide." Again, the parties disagree about the meaning of the term "said system." Further, the parties disagree whether element (f) requires all discharges from the system, or only those discharges attributable to the cleansing process, to be substantially free of hydrogen sulfide.

With regard to step (f), the plaintiff, rather than the defendant, argues for a limited definition of "said system." The plaintiff would limit the term to that system which chemically cleans geothermal

---

**10.** As mentioned earlier, a dispute over the meaning of claim terminology "must be resolved as a question of fact before interpretation [of the claim] can begin." *Perini Am.,* 832 F.2d at 584. Thus, the defendant has the burden of demonstrating an absence of any genuine issue of material fact concerning the meaning of "said system." The defendant did not satisfy its burden. Rather, the record supported a broader meaning of the term than proposed by the defendant.

steam, that is, the system used to operate the '506 cleaning process. The defendant views "said system" as the system for utilizing geothermal steam, that is, the entire system used to generate electricity.[11]

In connection with step (d), this court examined the meaning of the term "said system" based on language in the claim and the specification. Step (f) employs the same term, "said system," with the same meaning. The term as used throughout claim 57 covers the entire system to utilize steam at superatmospheric pressure for the generation of electricity. The language in the preamble of claim 57 expressly notes that the utilization system "produces discharges of liquid water and of noncondensable gases." Element (f) repeats this characteristic of the system and adds the requirement that the discharges be "substantially free of hydrogen sulfide."

Unlike step (d)—which limited itself to recovered (as opposed to all) steam and to delivery (as opposed to use) of that steam—step (f) governs all discharges from the utilization system. Thus, all liquid water condensates and all noncondensable gases discharged from the system must be substantially free of hydrogen sulfide to satisfy this element of claim 57.

The specification bolsters this reading of the clear language of step (f). The specification notes that an important object of the patented process is "to produce condenser effluents substantially free of hydrogen sulfide [thus] inhibiting or eliminating the environmental pollution control problems otherwise experienced with such effluents...." '506 patent, col. 2, lines 17–20. This statement indicates that the '506 patent envisioned a cleansing of all discharges from the system as a means of ending environmental problems.

The plaintiff maintains that "it is implicit that the term 'substantially free of hydrogen sulfide' in step (f) refers only to the disposition of the depleted steam which was recovered in step (c)." Pl. Brief filed Oct. 7, 1985, at 19. To the contrary, this conclusion is far from implicit. The language of step (f) states that discharges from the system will be substantially free of hydrogen sulfide. The specification further shows that the reason for this requirement is to prevent environmental pollution. Moreover, the prosecution history also supports the requirement that all effluents be clean.[12] The plaintiff offers little evidence to explain, qualify, or limit the clear meaning of the terms of step (f).

6. Element (f)—Infringement Analysis

The second step of analysis requires the court to determine if step (f) covers the accused process. During the accused 120–hour test, the effluents from the condenser were formed by mixture of the 900,000 pounds per hour of contaminated steam with the 100,000 pounds per hour of treated steam. The effluents were at least 90% contaminated with hydrogen sulfide.

The plaintiff concedes that the overall composition of liquid water condensate and noncondensable gases discharged from the condenser was not substantially free of hydrogen sulfide:

The Court: And do you say that the overall result was substantially free, or not?

Mr. Singer: The question is, was the overall result—I missed the second part of the question.

The Court: Substantially free.

Mr. Singer: Was the overall result substantially free.

(Pause)

Mr. Singer: The mixture was not substantially free, your Honor.

Transcript of Proceedings, No. 425–82C, July 18, 1985, at 28. Because the mixture of effluents from the system was not sub-

---

11. As noted during the discussion of step (d), the defendant argues that this utilization system only begins at the turbines. For reasons explained in the earlier section, this definition may well be too narrow because it fails to include the main line. For purposes of analyz-

ing element (f), however, the important question is whether the term "said system" is limited to the cleansing processes of the '506 patent.

12. See the discussion of prosecution history under the heading "Doctrine of Equivalents."

stantially free, the 120–hour test did not literally infringe step (f) of the '506 patent.

The plaintiff cites the case of *Interdent Corp. v. United States*, 209 Ct.Cl. 301, 312, 531 F.2d 547, 554 (1976), for the proposition that "impairment of function and lessening of results, efficiency or advantages do not avoid infringement where the substance is nevertheless appropriated." The next sentence of that opinion, however, states that "an impaired or inferior device which does not include the substance or novelty of the claimed invention does not infringe." *Id.* As the language of the claim, the specification, and the prosecution history indicate, step (f)'s requirement that discharges be substantially free of hydrogen sulfide was an important aspect of the substance and novelty of the '506 patent. Therefore, the dictum of *Interdent*[13] is inapposite because an essential element of claim 57 is absent from the accused process.

The language of the claim, the specification, and the prosecution history indicate that element (f) of claim 57 contains the requirement that all discharges be "substantially free of hydrogen sulfide." The description of the accused process, as well as the concession of the plaintiff that all effluents did not satisfy this requirement, provide ample evidence that the defendant did not literally employ this aspect of the patent.

## IV. *The Doctrine of Equivalents*

■ Although not literally infringed, a patent may nonetheless be infringed under the equitable doctrine of equivalents if the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. A process may be the equivalent of a patented process if the "accused operations do the same work, in substantially the same way, and accomplish substantially the same result." *Dominion Magnesium Ltd. v. United States*, 162 Ct.Cl. 240, 252, 320 F.2d 388, 396 (1963). The Federal Circuit has

clarified that this court may only grant relief under the doctrine of equivalents if the substantial equivalent of every element of the patent claim is present in the accused process. *Pennwalt*, 833 F.2d at 935. Because step (f) is the only element left unsatisfied by the accused process in connection with this summary judgment motion, this court must next seek the equivalent of step (f) in the accused process.

■ The accused process does not reach "substantially the same result" as step (f) of claim 57. Instead of discharging effluents "substantially free of hydrogen sulfide" to protect the environment, the accused process discharged effluents that were approximately ninety percent contaminated. This discharge record was not the result envisioned by the '506 patent or its substantial equivalent. Moreover, the '506 patent is only entitled to a narrow range of equivalents because, as indicated by eight comparable patents and articles reviewed in the prosecution history, it was a narrow improvement in a crowded field. *See Hughes*, 717 F.2d at 1351.

■ The plaintiff also fails to overcome the limits of prosecution history estoppel upon application of the doctrine of equivalents. The patent applicant, Mr. Jerome Spevack, markedly limited his patent claims to gain approval from the PTO. Consequently, the plaintiff is now estopped from recapturing through equivalence patent coverage abandoned during prosecution before the PTO. *Seattle Box Co. v. Industrial Crating & Packing Inc.*, 731 F.2d 818 (Fed.Cir.1984). As indicated by the following survey of the prosecution history, Mr. Spevack added the step (f) requirement to obtain the patent. The prosecution history thus estops the plaintiff from abandoning or substantially narrowing application of that requirement through the doctrine of equivalents.

### 1. Prosecution History

On August 6, 1976, Mr. Spevack first sought approval for a process entitled "Ex-

---

**13.** In *Interdent*, infringement was not found because the accused device (an electrical powered oral irrigating device) did not contain the essen-

tial element of the patented device. 209 Ct.Cl. at 312, 531 F.2d 547.

traction of Hydrogen Sulfide and Other Substances From Impure Steam." On March 31, 1977, the PTO rejected this original application as obvious and unpatentable under 35 U.S.C. § 103. The examiner relied upon the U.S. patents of Bacon and Collins, as well as British Patent Number '428 and German Patent Number '591 for the prior art of removing hydrogen sulfide from a gas with a metal salt solution. In addition, the examiner cited a publication by Alf Hansen (discussing the use of geothermal steam contaminated with hydrogen sulfide for the generation of electricity) and the U.S. patent of Coulter (proposing a system for washing steam with high purity water prior to its use in a turbine). Based on these established sources in the art of cleansing steam, the examiner rejected as obvious Mr. Spevack's application for a process patent to cover use of a metal salt to remove hydrogen sulfide from steam before contact with a turbine.

In June 1977, the applicant responded with an amended application.[14] Rather than a generic cleansing process for steam, the amendment clarified that the invention cleanses geothermal steam "prior to its use as an energy source, e.g. upstream of the turbine." Def. Brief filed Sept. 6, 1985, App. B at 92.[15] From the outset, the applicant had sought to gain approval for a gas cleansing system that removed contaminants upstream of mechanical equipment. When this failed, the applicant narrowed his application to a system for treating geothermal steam during energy production, rather than for generically cleansing all gases. This attempt also failed.

In a second office action mailed August 12, 1977, the examiner again rejected the application "as unpatentable over Bacon alone or in view of Hansen" because the Bacon patent covers a process to purify "gases containing hydrogen sulfide" by use of a chemical reactant. Id. at 127. The applicant proposed to purify steam, a gas containing hydrogen sulfide, with chemical reactants. The examiner found that the Bacon language already covered such a process. Moreover, the examiner continued, "[t]he recovery of the energy content from the geothermal steam is conventional obvious and taught by Hansen." Id. at 128. Once again, the office rejected the application as obvious in light of existent technologies.

At this juncture, the applicant sought additional information from the examiner about the reasons for rejection. In a supplementary office action mailed October 18, 1977, the examiner noted that prior art had focused on steam treatment, but overlooked that noxious contaminants must be "removed and disposed of in a manner that will not pollute the environment." Id. at 136.[16] With this clue, the applicant made the critical change in his application that gained approval, namely, addition of the "substantially free" requirement of step (f).

On January 13, 1978, the applicant responded with an amended specification clarifying that the process would "produce condenser effluents substantially free of hydrogen sulfide." Id. at 140. This same "substantially free" language was also incorporated into step (n) of the applicant's revised claim 1. Id. at 142. In explaining this change, the applicant noted that the prior art "had tolerated passage of the minor amount of noncondensable gaseous impurities through the steam processing equipment, with discharge of said impurities from the condensers to the environment." Id. at 149.

In defense of his invention, the applicant stated the advances accomplished by his proposal:

---

**14.** All actions by Mr. Spevack after the first rejection were actually undertaken on his behalf by Mr. J.Y. Houghton, his attorney. This court construes Mr. Houghton's activities to be attributable to the applicant, Mr. Spevack.

**15.** Moreover, the applicant claimed more specifically that "removal at the temperature and pressure of the steam [will] not ... materially

reduce its utility as an energy source." Def. Brief filed Sept. 6, 1985, App. B at 92.

**16.** This reference had not been relied upon by the examiner for the rejection, but nonetheless provided clear guidance for further substantiation of the application as a pollution control process rather than a generic gas cleansing technique.

As shown by the pertinent steam art it remained for applicant to depart from the beaten path and the precepts of that art in order to attain his invention as a whole, which as defined in his head claim 1 includes: ... and the concept that ... the liquid and off-gas effluents from the cooling and condensing equipment of the system will be substantially free of [hydrogen sulfide] contamination.

*Id.* App. B, at 150.

On the basis of this invention as a whole, the applicant then proceeded to catalogue advances made by his proposal over prior art. Unlike the application, the Paul *et al.* patent, for example, "made no attempt to utilize the naturally occurring impure geothermal steam as an energy source." *Id.* at 152. Instead Paul *et al.* devised a process to generate clean steam from clean surface water. Unlike the application, the Bacon patent "did not improve the utility of steam prior to its use as an energy source," "did not produce a water condensate from its system free of hydrogen sulfide," and "did not ... discharge ... noncondensable gaseous effluents from its reaction ... free of hydrogen sulfide." *Id.* at 155. Unlike the application, the Hansen article—both alone and in conjunction with the Bacon patent—failed to claim removal of "selected noncondensable gas from impure steam prior to its use as an energy source." *Id.* at 156. The Collins, Coulter, British and German patents were similarly distinguished as dealing only with specialized non-energy steam uses or lacking claims to remove substantially all pollutants from both liquid condensates and noncondensable gases.

On the basis of this presentation, the applicant received a second interview with the examiner. As a result of this meeting, an examiner's amendment, to which the applicant agreed, was mailed on May 4, 1978. This amendment replaced general references to "impure steam" with specific references to "geothermal steam," thus narrowing the application and distinguishing it from Bacon's generic gas treatment process. The amendment also included a new claim 75 (later renumbered as claim 57) which incorporated claim 67 in the original cancelled application.

Thus, the prosecution history of the '506 patent's application indicates that the key refinement enabling Mr. Spevack to avoid prior art was the addition of the step (f) requirement. Although, in the prosecution, claim 57 was also limited to apply solely to geothermal steam and to require use of the cleansed steam in the energy-producing system, the application failed until amended to specify that both liquid condensates and noncondensable gases would be "substantially free of hydrogen sulfide" before discharge from the system.

Having won the patent by including this limitation in claim 57, the plaintiff is now estopped to abandon that limitation during application of the doctrine of equivalents. Accordingly, the doctrine does not operate to establish infringement of step (f).

Because each step of a claim is "material and essential," *Pennwalt,* 833 F.2d at 935, the absence of a single claimed element in the accused process precludes a finding of infringement. *Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 558 F.2d 1000 (1977). The accused process did not employ step (f). The accused process did not infringe claim 57, the single independent claim of the '506 patent.

## V. *Effect of Interlocutory Order*

The second accused use occurred in the EIC pilot plant. The plaintiff claims that the defendant used treated steam to heat copper sulfate solution. Pertaining to this second use, the Claims Court issued an order on March 4, 1985, releasing EIC from liability for its participation at The Geysers.

The defendant contends that "[i]n releasing its claim against EIC for patent infringement, plaintiff has also released its right to recover from the Government under 28 U.S.C. § 1498." Def. Brief filed Sept. 6, 1985, at 20. The defendant argues that the Government stands in the place of EIC and is entitled to any defense available to EIC, including the defense of release and satisfaction. In support of this proposition, the defendant cites *W. Vinten Ltd.*

*v. United States*, 213 Ct.Cl. 759, 760 (1977). The defendant thus argues that the March 4, 1985 order released the Government from any infringement liability for activities within the EIC plant.

The plaintiff, to the contrary, asserts that it did not release EIC because it had not sued EIC for infringement in the first place. Instead, the plaintiff contends that EIC's activities, although not enough to constitute infringement by themselves, were part of the infringing activities of the Government. Thus, the plaintiff argues that *Vinten* does not apply to this case and that the March 4, 1985 order does not bar infringement proceedings against the defendant for uses within the EIC plant.

█ In construing the legal implications of this order, this court resolved all factual questions in favor of the plaintiff because the defendant had moved for summary judgment. The March 4, 1985 ruling was an interlocutory order which falls under the law of the case doctrine. Hence, the order ought to be followed as a matter of sound judicial practice unless the ruling is plainly wrong and is likely to result in injustice if followed. *International Elec. Corp. v. United States*, 2 Cl.Ct. 570, 572–73 (1983).

█ The parties agree that the order is valid, but interpret it differently. Upon review of the order's language, the *Vinten* case, and other relevant case law, this court determines that the order releasing EIC from patent infringement liability does not release the Government.

The March 4 order provides, in pertinent part:

> For purposes of this action, it will be conclusively presumed that the participation of third-party defendant E.I.C. Laboratories, Inc. in The Geysers project did not constitute direct infringement.

Order filed Mar. 4, 1985, at 1. By its terms, this order releases only EIC.

In the status conference leading to issuance of the order, the Claims Court described its purpose in the following terms:

> The Court: [i]t [the plaintiff] did take the position that EIC's role ... did not

constitute infringement.... It [the plaintiff's position] can, in the Court's view, be reconciled with a view that others that participated in that project might have been infringers....

> ....

> Again, read as broadly as one can fairly read its [the plaintiff's] position there, the assertion of noninfringement went to EIC only.

Transcript of Proceedings, No. 425–82C, Feb. 28, 1985, at 65–66. The language of the order, as fortified by the explanation of the judge that issued the order, clarifies that the order released only EIC.

In the status conference that produced the March 4 order, the plaintiff's counsel explained his reasons for releasing EIC:

> Mr. Singer: ... EIC's process is basically a process ... to take hydrogen sulfide gas out of steam or out of any gas.

> Deuterium's ... patents requires that gas to be geothermal steam and ... it involves doing more than just taking hydrogen sulfide out of that steam flow. It also has to be condensed ... [and] used [in] a power plant....

> [W]hile we concede that the EIC process itself didn't infringe, we argued that infringement would occur and did occur when somebody condensed [the treated steam] or used it.

> We certainly never agreed that PG & E didn't infringe.

*Id.* at 43, 49. Thus, plaintiff released EIC because it did not employ each step of the '506 patent, but only the cleansing steps. On the other hand, the plaintiff contends that PG & E took the cleansed steam from its subcontractor, EIC, and replicated the remainder of the '506 process patent.

The question of whether PG & E and the defendant infringed the patent by heating copper sulfate in EIC's plant, however, is not before this court in defendant's motion. This court is requested only to state the legal effect of the March 4, 1985 order. According to its terms and the stated intent of the court and the stated intent of plaintiff's attorney in consenting to the release, the order released only EIC.

The defendant notes, however, that the Claims Court, when describing the consequences of the release, stated that "[a]ny other necessary and logical implication formed from that admission will flow to the benefit of any of the other parties." *Id.* at 66. The defendant argues that, in light of the *Vinten* case, the "necessary implication" of releasing EIC is the release of the Government.

In *Vinten,* the plaintiff sued the Departments of the Navy and the Air Force for infringement which occurred when Mitchell Camera Corporation performed some defense procurement contracts. The plaintiff had already given Mitchell an exclusive license to use the patent. When the plaintiff released Mitchell, this court's predecessor, the Court of Claims, discharged the Departments as well from any liability under 28 U.S.C. § 1498.

This case differs from *Vinten* in several important respects. In *Vinten,* the contractor was responsible for the entirety of the alleged infringing activities. Therefore, Mitchell's release extinguished the entirety of the Government's connection with the infringement. The Court of Claims stated:

> Where a patentee's underlying claim against the infringing contractor is either defective or extinguished, there is no remaining cause of action against the government. There is no independent relationship between the plaintiff and the government.

213 Ct.Cl. at 761. In this case, however, release of PG & E's subcontractor does not cover the entirety of the alleged infringing activities nor the entirety of the Government's connection with the alleged infringement.

In the first place, the release of EIC apparently does not cover the entirety of the alleged infringing use. The plaintiff alleges that the subcontractor performed only certain tasks for PG & E, which, when combined with the rest of PG & E's activities, amounted to use of the '506 patent. Therefore, the target of the plaintiff's suit is PG & E. The Government, pursuant to a cooperative agreement with PG & E, has notified the plaintiff that liability for infringement of plaintiff's patent, if any, rests solely with the Government. Therefore, the Government, like PG & E, is not released upon release of PG & E's subcontractor. In this case, unlike *Vinten,* there is a remaining cause of action after release of PG & E's subcontractor, specifically, the cause of action against PG & E and the Government.

Similarly, the release of EIC does not extinguish the relationship of the Government with the alleged infringing use or user. The relationship of the Government to both PG & E and EIC is not entirely clear from the record. To the extent that PG & E stands in the same place as Mitchell did in the *Vinten* case, EIC's release does not release the Government. Only the release of PG & E would affect the Government's relationship with the user of the patent. The plaintiff, however, released only EIC and continues to assert a cognizable claim against PG & E for use of the '506 patent. To the extent that PG & E and the Government are partners—both of whom claim EIC as a subcontractor [17]—EIC still only performed part of the accused process for its supervisors who allegedly used the entire accused process. The relationship among the Government, PG & E, and EIC prevents this court from granting this motion in reliance upon *Vinten.*

The defendant also contends that "[s]ince it was EIC that operated the pilot plant it follows that it was EIC that used the accused process." Def. Brief filed Oct. 18, 1985, at 7. The plaintiff, on the other hand, submits that "any process used within the Pilot Plant is legally and effectively a use by PG & E and defendant." Pl. Brief filed Oct. 7, 1985, at 28.

---

17. The defendant hints in its reply that EIC might be the Government's contractor: "... the Government is entitled to *all* defenses available to its contractors." Def. Brief filed Oct. 18, 1985, at 7–8. This question of fact is not, however, conclusively established by the defendant's submissions.

EIC built the pilot plant and delivered it to PG & E. PG & E allegedly modified the EIC plant to facilitate the heating of copper sulfate. PG & E, the owner of the demonstration facility, subsequently employed EIC to operate the steam treatment plant. Under this subcontract, PG & E allegedly supplied the pilot plant with contaminated geothermal steam and received back cleansed steam. PG & E then allegedly utilized the steam in the heat exchanger prior to condensation and discharge of steam byproducts. PG & E apparently conceived, supervised, and received the benefits of, in sum, used the accused process. Because it only participated in a portion of the accused process, EIC cannot be held liable for an alleged infringement that covers the entire accused process. The release of EIC, a partial user, does not release the alleged user of the complete accused process, PG & E.

In conclusion, the March 4, 1985 order is limited to a release of EIC. The defendant does not stand in place of EIC, the subcontractor of PG & E (with which the Government has a cooperative agreement). Accordingly, the release of EIC does not operate legally to release PG & E or the defendant. The defendant's summary judgment motion in conjunction with the second alleged accused process is denied.

VI. *Motion to Strike*

 In conjunction with its opposition to defendant's motion for partial summary judgment, the plaintiff filed a motion to strike twenty pages in Appendix B of defendant's motion.[18] The plaintiff's motion was accompanied by a letter dated August 16, 1984, from Joseph F. Nakamura, Solicitor of the U.S. Patent and Trademark Office, stating that the objectionable pages should not have been included "in a certified copy of the file wrapper and contents of U.S. Patent No. 4,123,506." Pl. Motion filed October 7, 1985, at App. 2. In argu-

ment on November 9, 1988, the defendant's counsel also assured this court that "the pages that Plaintiff complains about are not relied upon in the Defendant's Motion for Partial Summary Judgment." Transcript of Proceedings, No. 425–82C, Dec. 9, 1988, at 90.

In light of these facts, this court grants the plaintiff's motion to strike the twenty pages. Acting upon the plaintiff's assurance that the remainder of the record found in Appendix B is available for resolution of this motion, this court has proceeded to resolve the defendant's motion for partial summary judgment without relying upon the subject pages.

## CONCLUSION

Although it delivered steam recovered from the treatment process under step (d) of claim 57, the process used during the accused 120–hour test did not discharge noncondensable gases and liquid water substantially free of hydrogen sulfide as required by step (f). Because step (f) was absent from the accused process, the defendant has avoided literal infringement of the '506 patent.

Moreover, the defendant did not employ the equivalent of element (f). The prosecution history establishes that the inventor of the '506 process distinguished his patent from prior art on the basis of the discharge of effluents substantially free of hydrogen sulfide. In the absence of this element or its equivalent, the defendant did not infringe the patent during the 120–hour test. Because independent claim 57 is not infringed, the seventeen other asserted claims which depend on claim 57 are likewise not infringed. Accordingly, this court grants the defendant's motion for partial summary judgment with respect to the 120–hour test.

With regard to the second accused use, the heating of copper sulfate inside the

---

18. Plaintiff's motion requests that pages numbered 17, 23, 33, 34, 143, 144, and 207–20 be stricken from the record of this case. The plaintiff, however, "[i]n the interest of expediting the proceedings," would permit Appendix B, as modified by the striking, to remain in the record as an uncertified copy of the file wrapper and contents of the '506 patent. Pl. Motion filed Oct. 7, 1985, at 2. This uncertified copy is "acceptable to plaintiff for the purpose of deciding Defendant's Motion for Partial Summary Judgment." *Id.*

EIC plant, the March 4, 1985 order did not release PG & E or the defendant from patent infringement liability. The defendant does not stand in EIC's place. Accordingly, this court denies the defendant's motion for partial summary judgment with respect to the heat exchanger use.

Finally, on the basis of the PTO Solicitor's memorandum and the defendant's assertion that the objectionable pages are not necessary to resolution of the partial summary judgment motion, this court grants the plaintiff's motion to strike twenty pages in Appendix B of defendant's brief filed September 6, 1985.

IT IS SO ORDERED.