**C.E. EQUIPMENT CO., INC.,**

and

**Harco Corporation, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant,**

and

**Orvedahl Construction, Inc., Third–Party Defendant.**

No. 16–85C.

United States Claims Court.

June 22, 1989.

---

A. Yates Dowell, Arlington, Va., and John W. Renner, Cleveland, Ohio, for plaintiffs.

Richard J. McGrath, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

Jack D. Elmquist, Minneapolis, Minn., for third-party defendant.

## OPINION

RADER, Judge.

Plaintiffs—C.E. Equipment Co., Inc. (C.E.) and Harco Corporation—are respectively the assignee and licensee of United States Patent No. 3,725,669, "Deep Anode Bed for Cathodic Protection," (the '669 patent). Under 28 U.S.C. § 1498(a) (1982), plaintiffs seek "reasonable and entire compensation" from the United States for infringement of the '669 patent. The '669 patent defines a method and apparatus for protecting buried metallic structures from corrosion. In particular, the '669 patent purports to disclose a novel method for replacing spent anodes.

Plaintiffs moved for partial summary judgment asserting that the United States Air Force (Air Force) infringed claims 1–3 and 5–11 of the '669 patent. This court, after oral argument, denies plaintiff's motion. Factual disputes prevent this court from interpreting contested terms in independent claims 1, 5, and 6. Factual dis-

putes also prevent this court from determining whether the accused devices and processes infringe each element of claims 1, 2, 5, and 6, or their equivalents. Because claims 2–3 and 7–11 depend on claims 1, 5, and 6, this court also denies the motion with respect to those claims.

## BACKGROUND

Underground metallic structures are particularly vulnerable to corrosion. Corrosion results from electrons flowing from the surface of a metal through the surrounding electrolyte (soil or water) to other metals, or areas of the same metal, with different electrical potential. Cathodic protection prevents electrolytic deterioration or corrosion. This method protects metallic structures by making them cathodic, or electron receiving, in relation to the surrounding electrolyte.

Cathodic protection reverses the flow of electrons by placing a charged anode in the ground some distance away from the underground metal structure. Instead of escaping from the underground structure, electrons flow from the sacrificial anode to the protected metal. Over time, the sacrificial anode corrodes until it can no longer supply an electron flow. At that point, the protected metal will again begin to corrode unless the anode is replaced.

Early methods of cathodic protection buried many anodes in shallow beds close to the protected metallic structure. These shallow anode placements had several economic disadvantages. For instance, the shallow beds consumed extensive ground space around the protected structure. The solution to this problem was to place the anodes in a single, deep well. A single anode in a deep well could protect miles of underground metal.

This deep well placement, however, presented other difficulties. Drilling new deep wells to replace spent anodes was expensive. Mr. Joe F. Tatum (inventor of the method and apparatus which became the '669 patent) recognized the need for a more efficient method of replacing anodes. His method, among other things, enabled users of the patent to avoid the costs of redrilling wells to replace expended anodes. The '669 patent also purports to enhance electrical continuity between the anodes and the surrounding soil and to vent gaseous byproducts of electrolytic reactions in deep anode beds.

The '669 patent includes "a method and apparatus for forming a deep well anode ground bed." The '669 patent, col. 2, lines 44–45 (Apr. 3, 1973). "By using the present apparatus and method," according to the patent, "the anodes can be easily replaced after they have deteriorated." *Id.* at col. 2, lines 56–58. In very general terms, the '669 patent apparatus includes a plastic casing (pipe) perforated with numerous angled openings. This casing is placed in a deep bore hole and filled with a granular electrically conductive material, such as coke breeze or calcined coke. The coke breeze also fills the annulus between the bore hole and the casing. The parties contest the degree of filling necessary for both the casing and the annulus.

The anodes rest inside the casing at different depths as dictated by the conductivity of the surrounding ground. The calcined coke settles around the anodes enhancing electrical contact and reducing resistance to current flow into the surrounding earth.

The angled openings purportedly establish electrical continuity between the inside and the outside of the casing and vent gases which would otherwise impede current flow. The anodes and the underground metal are connected to a direct current voltage supply. Current flows from the anode through the interior backfill, casing holes, and backfill in the annulus to the surrounding soil and finally to the cathodic, or electron-receiving, metal.

The patent also delineates a method for replacing expended anodes in deep wells. In very general terms, the patent claims to "fluidize" the coke breeze. With the conductive material (backfill) "fluidized," a user can allegedly extract the spent anodes with ease. New anodes, "sinking by gravity" into the "fluidized" material, can then replace the spent anodes. The coke breeze then settles back around the anodes.

The field of cathodic protection features other patents[1] and art prior to the '669 patent.[2] In the late 1970's the Strategic Air Command Corrosion Engineer, Mr. Robert L. Banks, developed a cathodic protection program for missile silos and underground gas distribution lines. In 1979, C.E. won a contract to install two prototype systems at Ellsworth Air Force Base. The Air Force has since installed approximately 1,100 deep well anode beds.

Plaintiffs contend the Air Force cathodic protection program infringes the '669 patent. Defendant maintains its program does not replicate or otherwise improperly use plaintiff's intellectual property. The pending summary judgment motion raises several specific issues.

First, defendant maintains that its practice of leaving empty the top 50 feet of casing does not infringe the '669 patent. Plaintiffs contend this practice infringes claim 1 by "substantially completely filling the interior of said casing with granular electrically conductive material." Thus, the first issue is the meaning of the claim terms "substantially completely filling."

Second, defendant argues that its process of washing the backfill completely out of the deep well casing during anode replacement does not infringe the patent. Plaintiff, to the contrary, insists defendant's system does "fluidize said material" as governed by claims 2 and 5. The second issue is the meaning of the term "fluidize."

Third, defendant insists that its washing out process skips an element of claim 2. Plaintiff contends defendant's process reads on claim 2's language. The language in question states that the "new anode sinks by gravity into the fluidized granular material." The third issue questions whether an element of claim 2 is missing from the Air Force's accused process.

Fourth, defendant argues that its system washes backfill out the top of the well—a procedure different from claim 5. Plaintiff contends defendant, perhaps with the exception of a single videotaped instance, employs claim 5's step of "controlling the flow of fluid so that granular conductive material is not discharged from the top of the bore hole." The fourth issue questions whether an element of claim 5 is missing from the Air Force's accused process.

Fifth, and finally, defendant contends that its process does not amount to "substantially filling said casing" as required by claim 6. For the same reasons stated in the first issue, plaintiff asserts that defendant's process infringes claim 6 as well as claim 1. This issue focuses on the meaning of the terms "substantially filling."

The parties directly dispute the meaning of some claim terms. Defendant presents ample evidence to place the terms "substantially completely filling" and "substantially filling" in genuine dispute. Defendant does not present enough evidence to place the term "fluidize" in dispute. Even where terms are not in dispute, however, defendant has demonstrated a genuine dispute about whether the Air Force's cathodic protection program employs each element of the claims or their equivalents. Therefore, this court denies the motion.

Defendant also attacks the validity of the patent in light of prior art. Because it denies the summary judgment motion, this court need not address the issue of patent validity. *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 91, 384 F.2d 391, 415 (1967).

## DISCUSSION

### Standards for Summary Judgment

RUSCC 56 authorizes imposition of summary judgment when "there is no genuine

---

1. United States Patent No. 3,458,643, "Ground Connection and Method of Making the Same" to Dorr, and United States Patent No. 3,616,354, "Method for Installing Cathodic Protection" to Russell involve various improvements in cathodic protection, including the use of granular electrically conductive material in a deep well anode bed.

2. As an example, the Air Force published a Student Study Guide, OTS5526-1-I-5, "Deep Well Anode Beds," dated 24 March 1965, describing the advantages of deep well cathodic protection.

issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." RUSCC 56(c). Plaintiffs, as the moving parties, bear "the burden of proving both the absence of genuine issues of material fact and entitlement to a legal judgment." *Deuterium Corp. v. United States and EIC Laboratories, Inc.,* 16 Cl.Ct. 454, 458 (1989), citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The court must resolve any conflict in inferences drawn from the underlying facts in favor of the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

These traditional standards for summary judgment apply fully to patent suits. *Chemical Eng'g Corp. v. Essef Indus., Inc.,* 795 F.2d 1565, 1571 (Fed.Cir.1986). The fact-intensive nature of infringement suits, however, requires particular caution with RUSCC 56 motions. *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir. 1985). This court set forth the applicable standards for summary judgment in patent suits more fully in *Deuterium,* 16 Cl.Ct. at 454.

### Standards for Infringement

■ To infringe[3] a patent, a device or process must operate fully "within the scope of the asserted claims as properly interpreted." *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir. 1984). Patent infringement analysis thus requires a two-step analysis. First, the court must interpret the patent claims. This step entails defining or ascertaining the scope of the claims as a question of law. In the second step, the ultimate determination of infringement, the court must determine whether the accused process or device as a matter of fact infringes the patent claims as interpreted. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1562 (Fed. Cir.1986); *Moleculon Research Corp. v. CBS Inc.,* 793 F.2d 1261, 1269–70 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987).

### Claim Interpretation

Claim interpretation—the first step of infringement analysis—necessarily precedes a comparison of the accused device or process with the properly construed patent claims. *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656 (Fed.Cir.1986). The court must define each element of the claims before considering whether the accused use infringed the patent either literally or under the doctrine of equivalents. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1118 (Fed.Cir.1985).

■ Claim interpretation is a question of law. Nonetheless "[i]f the meaning of terms in the claim ... is disputed, that dispute must be resolved as a question of fact before interpretation can begin." *Perini Am., Inc. v. Paper Converting Mach. Co.,* 832 F.2d 581, 584 (Fed.Cir.1987). Thus, the court must resolve disputes over the meaning of claim terms as questions of fact.[4] *Id.* Doubts about the meaning of claim terms must be resolved in favor of defendant, the party opposing this motion for summary judgment. Under these summary judgment standards as applied to claim interpretation, this court cannot con-

---

**3.** The term infringement, although not included in 28 U.S.C. § 1498, the basis of this suit, is a familiar term from 35 U.S.C. § 271 that this court uses to describe the alleged statutory violation—unlicensed use by or for the United States Government of a patented invention or process. *Deuterium Corp. v. United States and EIC Laboratories, Inc.,* 16 Cl.Ct. 454, 459, n. 3 (1989).

**4.** Claim construction may require the court to refer beyond the claim itself to other claims, the specification, the prosecution history, expert testimony, and texts such as dictionaries. *McGill,*

*Inc. v. John Zink Co.,* 736 F.2d 666, 671–75 (Fed.Cir.1984). An inventor may freely coin new expressions to communicate his invention. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985). Thus, the court must decide how the inventor defined the terms of the disputed claims. *Casler v. United States,* 15 Cl.Ct. 717, 731 (1988). The court may properly resolve this issue by construing the claim terms according to the understanding of individuals with ordinary skill in the art. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1571 (Fed.Cir.1983); *Loctite,* 781 F.2d at 867.

clusively determine the meaning of some disputed claim terms.

### "Substantially Filling"

■ Plaintiff asks this court to determine the meaning of the following language in claim 1:

> [S]ubstantially completely filling the interior of said casing with granular electrically conductive material after said anode is in place so that the conductive material within said casing is in intimate engagement with said anode and communicates with the conductive material exteriorly of said casing through said openings....

The '669 patent, col. 8, lines 56–61 (emphasis added). Claim 6 employs similar language:

> [G]ranular electrically conductive material *substantially filling* said casing and intimately engaging said anode....

*Id.* at col. 10, lines 14–15 (emphasis added). Defendant contends that this language requires filling to the top of the casing, while plaintiffs contend that "substantially completely filling" can mean only 75% full.

As shown by the claim language, the granular material serves the central purpose of conducting electrical current from the anodes into the surrounding earth. "Substantially completely filling" the casing makes sure that the conductive material "is in intimate engagement" with the anode and surrounding soil. As the conductive material settles within the casing, the weight of the entire cylinder full of coke presses the carbonaceous material firmly around the anodes. The intimate engagement ensured by "substantially completely filling" the casing thus increases electrical conductivity.

The patent specification emphasizes this purpose for "substantially completely filling":

> After the interior of the casing 25 has been filled to the desired level, the support line 51 is connected to the cap 40 and the carbonaceous material is permitted to settle for approximately 24 hours, after which the anodes are energized by the rectifier 53. The carbonaceous material provides a constant downward pressure to decrease resistance.

The '669 patent, col. 5, lines 53–59. The same purpose appears again in the specification:

> The increased pressure of the carbonaceous material at the anode surface causes more intimate contact between the carbonaceous material and the anode to reduce resistance to current flow and substantially reduce anode weight loss.

*Id.* at col. 6, lines 8–12.

This suggests that "substantially completely filling" means more than simply filling slightly above the level of the highest anode in the column. Rather, the language of the claim and the specification suggest the need for sufficient filling above the highest anode to guarantee complete settling. Defendant creates a factual dispute about the need for a column of coke above the highest anode to ensure intimate engagement.

This court expects expert testimony to discuss the need for downward pressure to ensure intimate engagement. Without that testimony, this court cannot determine what constitutes "substantially completely filling" within the meaning of claim 1. These issues will undoubtedly require evidence in the form of expert testimony about the specific gravity of calcined coke, the potential levels of the highest anodes in the column, and the alleged need "to completely fill the interior" of the casing. *Id.* at col. 5, lines 42–43. "In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim." *Moeller*, 794 F.2d at 657. In anticipation of this factual testimony, this court also withholds judgment on defendant's legal contention about prosecution history. According to defendant, that history shows that the inventor inserted the limitations "substantially completely filling" and "substantially filling" into the patent to avoid prior art.

The language of other claims in the '669 patent also complicates the definition of

"substantially completely filling." Claim 5 discusses "substantially filling" the bore hole with granular electrically conductive material. Claim 6 also drops the modifier "completely" from "substantially filling." Defendant clearly and plaintiff apparently recognize some distinction between "substantially filling" and "substantially completely filling." [5] To give meaning to all the terms of the patent, some distinction appears necessary.

Defendant also advances a second purpose for claim 5's filling language. Claim 5 requires filling of the deep well bore hole. Defendant suggests that this claim, in fact, requires filling to the surface of the earth. Otherwise, according to defendant, the bore hole walls would cave in and debris would collect in the open space, making the replacement method unworkable. Thus, defendant contends that providing support is an alternative purpose for the filling language. If expert testimony supports this reason for claim 5's filling requirement, then "substantial filling" would tend to acquire the meaning of "to the surface."

The United States Court of Appeals for the Federal Circuit has recognized that the term "substantially" in patent claims gives rise to some definitional leeway. *Seattle Box Co. v. Industrial Crating & Packing*, 731 F.2d 818, 829 (Fed.Cir.1984). Patentees may use these terms to avoid unduly limiting the modified word. Thus, the term "substantially" may prevent avoidance of infringement by minor changes that do not affect the results sought and accomplished. *Moss v. Patterson–Ballagh Corp.*, 89 F.Supp. 619, 635 (S.D.Cal.1950),

aff'd, 201 F.2d 403 (9th Cir.1953). *National Research Dev. v. Great Lakes Carbon*, 410 F.Supp. 1108, 1116 (D.Del.1975).

In any event, this court cannot ascertain the precise meaning of the terms of claims 1, 5, and 6 on the basis of the evidence as presented in this motion. The term "substantially" means "less than totally." In turn, "substantially completely filling" means less than completely filling, but how much less is a question of fact.

In the face of lingering factual issues, this court denies the motion with respect to claims 1 and 6. Because the evidence does not support a finding of summary judgment on these independent claims, summary judgment also fails on dependent claims 2, 3, and 7–11.

#### "Fluidize"

■ Although claim 2 technically falls within claim 1, this court addresses separate issues raised by claim 2. Claim 2 describes a process for replacing spent anodes. The claim encompasses:

> [I]ntroducing fluid under pressure into the granular electrically conductive material within said casing to *fluidize* said material after the anode has been substantially expended....

The '669 patent, col. 9, lines 1–5 (emphasis added). The patentee added a new meaning to the term "fluidize" to describe a step in the replacement process. The specification explains the patentee's meaning:

> The flow of fluid from the hose 56 fluidizes or suspends the granular carbonaceous material 48 in a fluid bath so that

---

5. Defendant articulated a distinction between the language of claims 1 and 6:

> The Court: Do you see any distinction as the Court was drawing earlier between substantially completely filling and substantially filling?
>
> Mr. McGrath: Yes, Your Honor.
> ....
> [I]t gives the Claim a little more latitude than the substantially completely filling, we're still saying that it still means, to the surface of the earth, or you know, I mean, in one instance maybe it's only a foot or two and then maybe the other emphasis may be, you know, five or ten feet....

Transcript of Proceedings, No. 16–85C, filed June 6, 1989 (Tr.), at 42–43. Plaintiff labored to justify the distinction:

> The Court: ....
> Is ["completely"], in fact, an intensifier that is requiring in Claim 1 that you go almost all the way to the top, whereas in Claim 6, you can just kind of fill it a little ways....
> Mr. Dowell: It would seem to have that meaning, Your Honor.
> The Court: So there is a distinction between the two?
> Mr. Dowell: Well, Your Honor, I can't say right at this moment whether I have any recollection of what the intent was at the time this was written....
> Tr., at 19.

the hose will sink by gravity into such material and will continue to fluidize the carbonaceous material for the entire length of the casing.

The '669 patent, col. 6, lines 57–63. Thus "fluidizing" means suspending the conductive material in fluid.

The patentee added to the standard dictionary meaning of "fluidize." As defined by *Webster's Dictionary*, "fluidize" means "to suspend (as solid particles) in a rapidly moving stream of gas or vapor so as to induce flowing movement of the whole." The patentee used this definition, but used fluid or water instead of gas to induce the suspension.

Defendant argues that "fluidizing" means more than suspending the conductive material in fluid. According to defendant, "fluidizing" means injecting water into the conductive material at a carefully controlled rate so that no material is discharged from the top of the bore hole. *See, e.g.,* Transcript of Proceedings, No. 16–85C, filed June 6, 1989, at 52–55 (Tr.). Claim 5, however, already contains an element concerning "controlling the flow of fluid so that granular conductive material is not discharged from the top of the bore hole." Moreover, a separate element of claim 5 employs the term "fluidize." Thus, the '669 patent itself distinguishes between "fluidizing" and controlling the fluidizing process to prevent overflows. Proper control of the process is not part of the definition of the process.

The specification underscores this distinction:

During this operation the flow of fluid is somewhat critical since there must be enough fluid being discharged from the hose to fluidize the carbonaceous material but not so much fluid that such material will be discharged from the top of the casing 25.

The '669 patent, col. 6, lines 64–68. The specification thus distinguishes between fluidizing the conductive material and controlling the fluidizing process.

Defendant's exhibits also concede this distinction. The exhibit purporting to present the Air Force's anode replacement technique attached to the declaration of Mr. Kenneth Berry gives the following directions:

Contractor to remove anodes by first refluidizing the anode well and pumping out the backfill material. . . .

Def. Brief filed Jan. 11, 1989, at A31. Thus, the Air Force recognizes that even its alleged "pumping out" process includes fluidizing the backfill material.

Thus, within the strictures of this summary judgment motion, this court can ascertain the meaning of "fluidize." "Fluidize," as used by the patentee, means to suspend the conductive material in fluid thus creating a slurry or solution of conductive material and fluid.

### *Ultimate Infringement*

Defendant does not appear to challenge the meaning of other terms in the '669 patent. Rather defendant contends that its cathodic protection program does not use various elements of the patent or their equivalents. Thus, defendant raises factual disputes about the second step of the infringement inquiry, ultimate infringement analysis.

The second step of infringement analysis—the ultimate factual determination of infringement—requires the court to decide whether the accused device or process employs each element of the properly interpreted claim or its equivalent. This court set forth the standards for literal infringement and infringement under the doctrine of equivalents in *Deuterium,* 16 Cl.Ct. at 460–61. This court is unable to interpret some claim language without additional testimony. Therefore, this court cannot reach the second step on several claims.

Moreover, factual disputes about the nature of the accused methods prevent other determinations of ultimate infringement. For instance, defendant maintains that its anode replacement process washes the backfill out of the top of the casing. Thus, the Air Force purportedly lowers the replacement anodes into an empty casing. After the anodes are in place, the Air Force

method presumably provides for refilling the casing with conductive material.

Under such a procedure, an element of claim 2 and an element of claim 5 would be missing. Claim 2 states:

[P]lacing a new anode within said casing so that said new anode *sinks by gravity into the fluidized granular material* within said casing.

The '669 patent, col. 9, lines 7–9 (emphasis added). Under the procedure allegedly employed by the Air Force, the replacement anode would sink by gravity into an empty casing, not into fluidized coke. Claim 5 states:

[C]ontrolling the flow of fluid so that granular conductive material *is not discharged from the top of the bore hole.* . . .

*Id.* at col. 9, lines 33–35 (emphasis added). Under the procedure alleged by defendant, the Air Force washes the backfill material out of the top of the casing. Moreover defendant contends the Air Force does not control the flow of fluid, but injects water at high pressures to wash out the coke.

Defendant offers the testimony of Mr. Kenneth Berry in support of its allegations about the nature of the accused processes. Mr. Berry notes:

I have been present when Air Force personnel have used the recommended procedure to replace failed anodes.

Declaration of Mr. Berry, Def.Brief filed Jan. 11, 1989, at A28. Mr. Berry attaches to his declaration an exhibit purporting to describe the Air Force's process. The exhibit requires "pumping out the backfill material at least down to the level of the lowest anode." *Id.* at A31. This evidence, in conjunction with other evidence presented by defendant, creates a factual dispute about the ultimate infringement of claims 2 and 5 of the '669 patent.

The Air Force process infringes the "fluidizing" element of the claims. As properly interpreted, the term "fluidize" encompasses suspending the backfill in fluid. In addition to the document submitted by Mr. Berry noting that the Air Force "refluidizes" the coke before allegedly pumping it out, plaintiff also produces

a contract showing use of the "fluidizing" technique. The Air Force entered a contract for cathodic protection at Grand Forks Air Base. Under section 6 of that contract, entitled "Installation," the Air Force agreed:

Anode assembled shall have the capability of being replaced by *fluidizing* the backfill so that the anode assemblies can be removed from the hole and the electrodes renewed, when required, without the requirements of any additional drilling.

Pl.Brief filed Mar. 27, 1989, App. at 16642–14. Thus, the Air Force contracted to "fluidize" the backfill during the anode replacement process.

During oral argument, defendant admitted that the Air Force's process satisfies the definition of "fluidizing" by creating a solution or slurry of water and coke:

The Court: Isn't it impossible to wash this granulated, conductive material out of the ground without fluidizing it?

Mr. McGrath: Your Honor, we do not dispute that a slurry is created when water is injected into the coke breeze material.

The Court: Therefore, you're fluidizing it?

Mr. McGrath: Well, fluidizing in the sense of what's in—the word fluidizing has a specific meaning as defined by the patent, that's our position.

Tr. at 52. Defendant's counsel then proceeded to restate the position that "fluidizing" means controlling the flow and preventing overflows. Defendant's definition of "fluidizing" is inaccurate and simply invokes language found elsewhere in the patent claims. Therefore, defendant's only response to charges that it "fluidizes" the backfill is that its process does not infringe other claims about controlling the flow and preventing overflows. Defendant does not present any other reason that its process does not employ the "fluidizing" element of the '669 patent. To the contrary, defendant concedes that its process creates a slurry or a fluidized solution of water and coke as envisioned by the '669 patent.

Although defendant does "fluidize" the coke, this term appears in claims 2 and 5. Defendant has raised factual disputes about new anodes sinking by gravity into the backfill and preventing overflows. Therefore, this court withholds judgment on the ultimate infringement of claims 2 and 5.

*Conclusion*

This summary judgment motion presents several issues of fact about the interpretation and application of the '669 patent. Factual disputes about the meaning of the terms "substantially completely filling" and "substantially filling" prevent this court from resolving issues with respect to claims 1, 5, and 6. Factual disputes about the nature of the accused process prevent the court from determining whether the Air Force sinks the replacement anodes by gravity into fluidized coke, or controls the flow of fluid to prevent the discharge of backfill from the top of the casing. Thus, this court cannot apply ultimate infringement analysis to claims 2 and 5.

This court, however, has determined the meaning of the term "fluidize." Furthermore this court determines that the Air Force's accused processes employ this aspect of the '669 patent. This element, however, appears in claims 2 and 5, which this court cannot fully interpret or apply for other reasons.

This court, therefore, denies plaintiff's summary judgment motion with respect to claims 1, 2, 5, and 6. Claims 3, and 7–11 depend upon either 1, 5, or 6. Those dependent claims necessarily fail with the denial of summary judgment for the independent claims. Plaintiff's summary judgment motion is denied.